**ARKANSAS–MISSOURI POWER CORPORATION, Plaintiff,**

v.

**Roy PASCHAL et al., Former Collectors of Internal Revenue for the District of Arkansas, Defendants.**

**No. 1846.**

United States District Court
E. D. Arkansas, W. D.

July 6, 1956.

Lasley & Lovett, Little Rock, Ark., and L. A. Swanson, Chicago, Ill., for plaintiff.

Osro Cobb, U. S. Atty., James W. Gallman, Asst. U. S. Atty., Little Rock, Ark., and Lester Gibson, Tax Division, Dept. of Justice, Washington, D. C., for defendants.

TRIMBLE, Chief Judge.

1.

This proceeding, consolidated for trial under Civil No. 1846, seeks the recovery, in separate suits, of income taxes, plus statutory interest, as follows:

| | | |
|------|---|-----------|
| 1939 | – | $  5,542.73 |
| 1940 | – | 51,607.36 |
| 1941 | – | 91,244.26 |
| 1942 | – | 32,367.87 |
| Total | – | $180,762.22 |

2.

The Arkansas-Missouri Power Corporation, plaintiff in all of the consolidated cases, is a corporation organized under the laws of the State of Delaware as successor corporation to Arkansas-Missouri Power Company and is authorized to do business in the State of Arkansas. The various defendants were each severally Collectors of Internal Revenue for the District of Arkansas during the periods involved.

3.

On March 15, 1940, the Arkansas-Missouri Power Corporation filed its corporation income and excess profits tax return for the calendar year 1939 with the then Collector of Internal Revenue, Homer M. Atkins, and on said date, as part of the taxes shown due on said return, paid to the then Collector $10,640.42. Subsequently, on June 6, 1940, September 11, 1940, and December 11, 1940, it paid the defendant Roy Paschal, as such Collector, $10,640.42, being the total tax reported and paid on said return of $42,461.66.

4.

On April 10, 1941, after an audit of said return, plaintiff paid to the defendant Roy Paschal a deficiency assessment of $315, which was assessed on the Commissioner's April, 1941, assessment list, and in November, 1946, the Commissioner assessed a further deficiency of $61.41 which was paid to Collector Horace E. Thompson. These additional assessments are not material to the issue involve herein.

5.

On March 10, 1943, plaintiff filed with Roy Paschal, as Collector aforesaid, a claim for refund of $5,542.73 of the amounts so paid, together with interest. The claim for refund was rejected December 16, 1946. The basis of the claim for recovery is in words and figures as follows:

"The tax to be refunded (along with interest thereon) was paid on $29,172.22 denied as an allowance of amortization of bond discount and expense applicable to the First Mortgage 5 per cent Series A bonds due January 1, 1957 issued by the Taxpayer."

6.

On March 8, 1941, plaintiff filed a tentative corporation income and excess profits tax return for the year 1940 with the defendant Roy Paschal, as Collector. Its final return was filed on or about May 6, 1941, and on March 7, May 1, June 5, and September 9, 1941, plaintiff paid to the defendant Roy Paschal, as Collector, taxes for the year 1940 amounting to $51,859.19, as shown due on said return.

7.

On July 18, 1942, plaintiff filed a claim for refund with defendant Roy Paschal, as Collector, for refund of $51,859.19, with interest, and on or about March 27, 1947, said claim for refund was rejected, except as to an item of $251.83 allowed

as an overassessment, which is not material to a decision here. The basis of the claim for recovery is in words and figures as follows:

"In report of March 5, 1941, IT:-OCS:WMCM, signed by the Internal Revenue Agent in Charge, Oklahoma City, Okla., a valuation of 85% was placed upon our 1st Mortgage Bonds as at May 1, 1937; such bonds were retired by cash paid in 1940, consequently, bond discount was realized in 1940 which cancels the taxable income shown on our 1940 income tax return—Form 1120."

8.

On March 14, 1942, plaintiff filed its corporation income and declared value excess profits tax return for the year 1941 with the defendant Roy Paschal, as Collector. On that date and on June 8, September 3, and December 14, 1942, plaintiff paid to the defendant Roy Paschal, as Collector, the full amount of tax reported due in the sum of $180,235.95, which said amount was assessed on the Commissioner's 1942 March list. After an audit, and on November 21, 1946, plaintiff paid to defendant Horace E. Thompson, as Collector, a deficiency assessment on account of additional income tax earned for the year 1941 the sum of $1,839.93.

9.

On May 10, 1943, plaintiff filed with defendant Horace E. Thompson, as Collector, a claim for refund of $91,344.26 of the amount paid, with interest, which claim was rejected December 16, 1946. The basis of the claim for recovery is in words and figures as follows:

"The tax to be refunded (along with interest thereon) was paid on $111,695.45 denied as an operating loss carry-over arising from the retirement in 1940 of First Mortgage 5% Bonds, Series A., due January 1, 1937, in principal amount of $2,706,750.00, issued by the Taxpayer in 1937 and valued at 85%, thereby establishing a discount of 15%. The remaining discount realized in 1940 on the $2,706,750.00 principal amount of bonds outstanding as at December 31, 1939 was 12.9666% or $350,973.45 which resulted in a deficit of $113,305.54 for the taxable year ended December 31, 1940."

10.

On or about March 11, 1943, plaintiff filed its corporation income and excess profits tax return for the calendar year 1942 with the defendant Roy Paschal, as Collector, and paid the amounts reported due on said return.

11.

On June 12, 1950, plaintiff filed a claim for refund for the year 1942 in the amount of $22,573.36, plus interest thereon in the amount of $9,794.51. The said claim for refund for 1942 likewise was based upon a credit carry-over on account of alleged amortization of bond discount in prior years. The Commissioner has not rejected this claim.

12.

The history of the taxpayer corporation may be summarized as follows: On or about February 23, 1935, the United States District Court for the Northern District of Illinois, Eastern Division, approved a petition filed February 21, 1931, of the Arkansas-Missouri Power Company, an Arkansas corporation (predecessor of plaintiff), for reorganization pursuant to Section 77B, Chapter VIII, of the Federal Bankruptcy Act, 11 U.S. C.A. § 207. The properties of the Arkansas-Missouri Power Company were located in 17 counties of Southeast Missouri and Northeast Arkansas and consisted generally of electric generating plants, transmission lines, local distribution systems, ice manufacturing plants, a water system, and cash, accounts receivable.

13.

In accord with such plan, and as set forth in such plan, taxpayer acquired all the properties of the old company, subject to its mortgage to the St. Louis Union Trust Company, as trustee, dated January 1, 1923, securing its first mort-

gage bonds and its taxes and assessments which were a lien on this property with the understanding that a certain unfinished transmission line would be retained by the old company pending complete construction thereof. This property was later turned over to the taxpayer, the new corporation.

14.

While the affairs of the old company were in the hands of the District Court and pursuant to the authority and by direction of said United States District Court for the Northern District of Illinois and by consent of the interested parties, Day & Zimmerman, Inc., a nationally known and reputable firm of appraisal engineers, was employed and directed to inventory the property of the predecessor, Arkansas-Missouri Power Company, and make an appraisal report in respect to all the properties of said company.

15.

Thereafter, Day & Zimmerman, Inc., carried out the appraisal and set forth the results thereof in a report, dated August 26, 1935, entitled "Report No. 3092, on Arkansas-Missouri Power Company, Blytheville, Arkansas", which is filed herein as Plaintiff's Exhibit 9. This report was the basis of the plan of reorganization of the Arkansas-Missouri Power Company and was entitled "Modified Plan of Reorganization of the Arkansas-Missouri Power Company".

16.

Pursuant to the Modified Plan of Reorganization the Arkansas-Missouri Power Corporation was organized for the purpose of reorganization of the Arkansas-Missouri Power Company and took title to said property as of May 1, 1937, under the Modified Plan of Reorganization and with the approval of the Bankruptcy Court.

17.

Pursuant to the Modified Plan of Reorganization the Arkansas-Missouri Power Corporation, taxpayer herein, caused to be issued as of May 1, 1937, $2,834,640 of First Mortgage 5% bonds due January 1, 1957; $944,880 of 6% Cumulative Preferred Stock of a par value of $50 per share; and 165,805 shares of Common Stock of a par value of $1 per share in exchange for the properties of the Arkansas-Missouri Power Company and the surrender of the bonds held by the prior mortgagor, whereupon these securities were distributed as shown in the Modified Plan of Reorganization.

18.

As a result of the appraisal by the engineers the property values of the old company were reduced when brought to the books of the taxpayer and, in turn, the taxpayer's net values were reduced by the Internal Revenue Service. These reductions are summarized as follows:

|  | Company | Taxpayer Per Books | Amended IT:OCS: |
|---|---|---|---|
| Utility Plants: |  |  |  |
| Depreciable | $4,562,329.04 | $4,559,170.84 | $4,559,170.84 |
| Non-depreciable | 2,032,701.39 | 132,172.89 | 132,172.89 |
| Totals | 6,595,030.43 | 4,691,343.73 | 4,691,343.73 |
| Less: Depreciation | 177,816.17 | 678,912.09 | 1,088,294.43 |
| Net Values | 6,417,214.26 | 4,012,431.64 | 3,603,049.30 |
| Taxpayer's 1st Mtg. Bonds |  | 2,834,625.00 | 2,834.625.00 |
| Excess of properties over bonds |  | 1,177,806.64 | 768,424.30 |

**19.**

The original plan of reorganization did not meet with the approval of the Public Utilities Commission of the State of Missouri and an order, dated January 10, 1936, was entered approving said plan upon condition that the accruals for retirement expenses should be based upon the engineers' estimate of the depreciable property of the Arkansas-Missouri Power Company as of May 31, 1935, and subsequent net additions and betterments to such property. On April 30, 1937, an order was entered approving said Modified Plan of Reorganization by the Missouri Public Service Commission.

**20.**

A similar order was entered on January 8, 1937, by the Department of Public Utilities of the State of Arkansas, wherein it ordered that the amount of the securities to be issued under the Modified Plan of Reorganization should not exceed the fair value of the property involved.

**21.**

In the approval of the Public Service Commission of the State of Missouri, dated April 30, 1937, after detailing the manner in which the reorganization should be carried out, both as to the mortgage indenture and the bonds issued thereunder, as well as the exchange for stock, the Commission found and was of the opinion—

" * * * that the amount of stocks, bonds, warrants, special bond coupons and cash scrip proposed to be issued under the said Modified Plan of Reorganization does not exceed the fair value of the property involved and further finds that, in its opinion, the property to be paid for the issuance of said securities is reasonably required for the purpose of effecting a reorganization of Arkansas-Missouri Power Company."

**22.**

The reorganization was carried out pursuant to the terms and conditions of the Modified Plan of Reorganization agreed to by the interested parties, the Federal District Court before whom the proceedings was pending, and approved by the Public Utilities Commissions of the States in which the company operated. The Modified Plan of Reorganization, together with exhibits thereto, is by reference made a part of this finding.

**23.**

The reorganization thus consummated and carried out was a taxable reorganization under the income tax laws of the United States.

**24.**

It may be further stated that at the time of reorganization on May 1, 1937, the plaintiff entered upon its books net plant and other assets aggregating $4,-493,969.94 as follows: Depreciable property, net after accrued depreciation—$3,-880,258.75; Land and non-depreciable property—$132,172.89; Cash and other asset accounts, less liabilities assumed—$115,955.06; Common Stock of East Missouri Power Company, net—$350,000; Salvage Materials—$15,583.24.

**25.**

The fair market value of the property listed in the above paragraph as of May 1, 1937, the date of reorganization, did not exceed $4,084,587.60 or $409,382.34 less than the same property was entered on the books of the plaintiff. All of the $409,382.34 is applicable to depreciable property, reducing the figure of $3,880,-258.75 to $3,470,876.61.

**26.**

For the property described above the plaintiff, as heretofore stated, issued and delivered as of May 1, 1937, for distribution as per said Modified Plan of Reorganization, bonds of the aggregate par value of $2,834,625; 18,897½ shares of 6% Cumulative Preferred Stock of the par value of $50 per share, aggregating $944,875; 165,805 shares of Common Stock of the par value of $165,805; and paid the cash and delivered the scrip, all as provided by said Modified Plan.

**27.**

The plaintiff also entered upon its books as of the date of the reorganiza-

tion capital surplus of $548,664.94. It is established that the fair market value on May 1, 1937 of the securities issued as aforesaid was as follows: $2,834,625 par value First Mortgage 5% Bonds, at 85% of par, aggregating $2,409,444 or $425,-181 less than par; 18,897½ shares of 6% Cumulative Preferred Stock, $36 per share, aggregating $680,313.60; 165,805 shares of Common Stock, $6 per share, aggregating $994,830, making a total aggregate fair market value of the securities of $4,084,587.60.

### 28.

The following is a statement showing assets received at May 1, 1937, in exchange for securities in reorganization:

|  | Per Books | Adj. | As Amended |
|---|---|---|---|
| Depreciable Property | 3,880,258.75 |  | 3,470,876.41 |
|  |  | −409,382.34 |  |
| Nondepreciable Property | 132,172.89 |  | 132,172.89 |
| Property Salvage | 15,583.24 |  | 15,583.24 |
| Stock East Mo. Power Co. | 350,000.00 |  | 350,000.00 |
| Cash | 612,590.96 |  | 612,590.96 |
| Other Assets | 302,770.79 |  | 302,770.79 |
|  | $5,293,376.63 |  | $4,883,994.29 |
| Liabilities Assumed | 799,406.69 |  | 799,406.69 |
| Net Worth | 4,493,969.94 |  | 4,084,587.60 |
| Securities Issued |  |  |  |
| First Mortgage Bonds | 2,834,625.00 |  | 2,834,625.00 |
| Preferred Stock at Par | 944,875.00 |  | 944,875.00 |
| Common Stock at Par | 714,469.94 |  |  |
|  |  | −409,382.34 | 305,087.60 |
|  | 4,493,969.94 | . | 4,084,587.60 |

### 29.

The foregoing assets were included in their entirety in the mortgage indenture given by the taxpayer to the trustees to secure the first mortgage bond issue.

### 30.

Subsequent to the redemption of the bonds in 1940 the entire capital stock of East Missouri Power Company, which cost its predecessor, Arkansas-Missouri Power Company, $563,675, was sold on June 7, 1945, at a price of $600,000, the value of which had been shown on the statement of assets received as of May 1, 1937, in exchange for securities in reorganization at $350,000.

### 31.

At the date of the redemption of the bonds in 1940 there had been no other sales of the properties given to secure the mortgage indenture of January 1, 1937, but the balance sheets of the taxpayer issued subsequent to May 1, 1937, indicated additions by way of purchase and increase in value of all the assets to and including the redemption of the bonds.

The foregoing statement comprises various findings of fact proposed by counsel for both parties and will be considered the Court's Findings of Fact, the controlling elements of which are these: First, the total fair market value of the assets received by the plaintiff on May 1, 1937, established by competent evidence was $4,084,587.60 and the total fair market of the bonds and stocks given in exchange for the assets likewise established was, on May 1, 1937, $4,084,587.60, the fair market value of the preferred stock at $36 a share being $630,313.60, the fair market value of the common stock at $6 a share being $994,830, and the fair market value of the bond issue at 85¢ on the dollar being $2,409,440.

From this it is seen that the aggregate fair market value of the common and

preferred stock and the par value of the bonds exceeds the fair market value of the assets to the extent of more than $400,000. However, by no method of calculation can the value of the assets be found to be less than the par value of the bonds.

The difficulty that confronts the court is the attempt to find the answer to the questions of law posed by counsel for both parties. The first of these questions, the one argued at length, both orally and in the briefs, is whether the Treasury Regulations providing for deductions as interest of "discounts" on bonds apply in cases where, in a reorganization proceeding, bonds are exchanged for property. The other question is whether the bonds in this case were issued, or exchanged, at a discount.

With respect to the answer to the first question, the decisions of the Board of Tax Appeals and the Courts of Appeal have had the effect of confusing me as to what is the correct answer or whether the answer has in fact been found.

Counsel for plaintiff place considerable reliance upon the case of American Smelting & Refining Co. v. United States, 3 Cir., 130 F.2d 883, 885. This opinion does squarely hold that the discount in the exchange of bonds for stock to the extent of the excess of the par value of the bonds over the market value of the stock is to be treated as interest. In that case bonds were issued in exchange for the stock of a subsidiary company and the taxpayer claimed that it suffered a loss when it was required to give a share holder a plus cash payment of $7.50 in the exchange of a $100 5% bond for a $100 par value share of preferred stock. The court in passing on this question said:

"We believe that the discount is still to be treated as additional interest when the subject matter of the loan is stock instead of cash. It is clear in both cases that the discount, or additional interest, is determined at the time the bonds are issued. Thus, when the investor is paid the face amount of the bond at maturity, he is taxable for the difference between that sum and the cost of the bond. Here the cost of the bond is the fair market value of the stock at the time the corporate obligations were exchanged. To sustain the government's contention, in view of these considerations, would be to say, in effect, that, on the same loan, the taxable 'interest' earned by the investor varies in amount and is computed as of a different time than the deductible 'interest' paid by the obligor. We think that this not only distorts, unnecessarily, the ordinary incidents of a commercial transaction but also upsets the balance of the tax situation.

"We do not think, therefore, that the question whether amortization is permitted is settled by making the dividing line between transactions in which bonds are issued for cash and transactions where bonds are issued for something else. We do see the possibilities of great difficulty in determining, with sufficient exactness, the difference between the par value of the bonds and the thing other than cash received for the bonds by the obligor. We think in this case the taxpayer has met that difficulty, except as to part of the 5% shares, discussed below. He has shown the selling price of part of the 5% and all the 6% preferred stock of the company whose shares the taxpayer took in for the bonds, and this by reference to the open market of the New York Stock Exchange. This is further checked by showing the selling price of the taxpayer's bonds in transactions shortly after, or during the time under consideration. It is proof, it seems to us, sufficient to establish the value of what was received in exchange for the bonds issued. It shows the stock, when received, was worth less than the par value of the bonds given for it and how much less. That seems to us to bring the taxpayer within the rule which per-

mits the amortization of this discount under the rules stated by the Regulations and approved by the Supreme Court."

There was a logical dissenting opinion by Circuit Judge Jones in the American Smelting and Refining Company case and the subject again arose before the same court (United States Circuit Court of Appeals, Third Circuit) in the case of the Montana Power Co. v. United States, 232 F.2d 541.

Seven judges sat as the Court of Appeals in that case, including Judges Goodrich and Biggs who rendered the majority opinion in the American Smelting and Refining Company case. All of the members of the court except Chief Judge Biggs voted to affirm the judgment of the District Court on the ground that the taxpayer was not entitled to relief on account of failure to establish the fair market value of the property involved. The opinion of the court was written by Judge Kalodner in portions of which he and Judge Staley only concurred, with Judge Hastie joining them in their conclusion in one very important portion of the opinion. Chief Judge Biggs dissented in part and concurred in part. The result of the decision of the Court in the Montana Power Company case is that six of the judges are in agreement on the necessity of the establishment of the fair market value of the property involved; two of them express the view that the Treasury Regulations relating to bond discounts are inapplicable in situations where bonds are issued in payment of property; three of them are in agreement that where bonds are issued in payment of property, the Treasury Regulations regarding discount cannot be invoked where there was no arms-length dealing. The reasoning and the authority cited in the concurring portion of the opinion are strongly persuasive, both on the position taken by the concurring judges that the discount of bonds is applicable only where there is a *sale* of the bonds as differentiated from the *issuance* thereof, and on the position taken by the concurring judges that the bond discount provision of the Treasury Regulations can never be made available in reorganizations under the Bankruptcy Act where there was no arms-length dealing. However, due to the division of authority at the present time, I am still left in doubt as to what the result will be when these two questions are fully considered and definitely answered by the appellate courts.

I am somewhat in the position of the majority of the presiding judges in the Montana Power Company case, because I have reached a determination of the main issue in this case for a reason other than those discussed by Judge Kalodner.

The plaintiff must stand or fall upon its position that its bond issue of $2,834,640 was exchanged at a discount because the aggregate par value of the bonds and the fair market value of the stock issued and delivered for the assets received exceeded the fair market value of the assets to such an extent as to amount to a 15% discount of the bonds. If the stock issued had represented obligations of the corporation as did the bonds, a basis to support this position of the plaintiff would be found. But that was not the situation at all. Stocks such as these constitute what in trade-parlance are known as 'equities'. They may be of great value, of small value, or of no value at all. They had no maturities, and were not direct charges against the assets of the company. True, it was shown, in fact, it was admitted that the stock had a market value but that did not affect the liability of the plaintiff company. The liability of the company for the payment of money was limited to the par value of the bonds issued and it received property having a value in excess of the amount of the bonds issued.

It would unduly extend this memorandum to cite the voluminous authorities that support the principle that the entire assets of the corporation were subject to the payment of the bonds as opposed to any claims of the stockholders and that due to this well established

principle of law, the plaintiff cannot maintain its position that the assets received by it in the reorganization were less in value than the face value of the bonds issued.

I have not overlooked the citations contained in plaintiff's brief of the Pierce Oil Corporation Case, the Hummel-Ross Fiber Corporation Case, and The Natural Gas Pipeline Company of America Case.

I believe that in none of those cases does it appear that the property received in exchange for the bonds was of greater value than the par value of the bonds. In the Natural Gas Pipeline Company case, 45 B.T.A. 939, the Commissioner was merely recognizing a contractual agreement between the company and the holders of its outstanding two year 8% notes. The effect of the opinion was to permit the amortization of a discount which arose as a result of the delivery of the taxpayer's $60,000,000 6% bonds along with 1,499,000 shares of common stock in payment for the surrender of notes of the taxpayer in the amount of less than $60,000,000 principal and accrued interest. It is apparent that in that case the bonds were issued at a discount and the litigation arose not over the question of the right to pro rate the bond discount, but upon the amount to which it was entitled.

Plaintiff's complaint is that it actually received property that was of less value than the par value of the bonds and the market value of the stocks issued. In other words, that it paid too much for the property and that theoretically it was euchred out of $409,000 by what it terms the arbitrary maneuver of a tax official in reducing its basis for depreciation. By this action, plaintiff charges, an injustice has resulted. Plaintiff itself has, in the trial of this case, arrived at practically the same valuation of its assets as that fixed for tax purposes. No effort was made by the plaintiff, so far as this record shows, to effect a re-evaluation of the assets, but it is now attempting to restore its alleged tax losses by the means of this suit. Or, perhaps I should say it is plaintiff's position that the Government by this action of reducing the value of its property has laid itself liable to the plaintiff for taxes unlawfully collected by reason of failure of the Commissioner to allow deductions for bond discount.

As heretofore stated, the evidence establishes the plaintiff's contention that the fair market value of the assets received was less than the fair market value of the bonds and stocks issued in exchange therefor, but, in this case, where neither a cash nor arms-length transaction was involved such difference in values is not, in my opinion, a test for establishing a bond discount. Accepting the fair market value of the assets as being $4,084,587.60 the realities of the transaction were these. Bonds of the par value of $2,834,640 secured by first lien on all of the assets of the corporation were issued and delivered to the vendors, not at a discount, but for assets that were equal in value to more than the par value of the bonds. Common stock of the par value of $165,000 and preferred stock of the par value of $944,880 were issued and delivered. The books of the company reflected no deficiency in assets. Of course, the directors were acting within their legal rights in so valuing the assets, for the new corporation was a corporation organized under the laws of the State of Delaware where the law provides that the consideration for stock may be cash, labor, personal property, real property, etc., and that stock issued for such consideration is full-paid and not liable for any further payment and, in the absence of actual fraud, judgment of the directors as to the value of the consideration is conclusive.

The Arkansas-Missouri Power Corporation was not in the business of buying and selling stocks and bonds and was not directly concerned with the market value of its own securities. Its objectives were to obtain title to the assets of the public utility and to have the privilege of carrying on the business of the utility. It gained both of these objectives by

complying with the order of the Federal Court and the requirements of the Public Service Commissions of the States of Missouri and Arkansas.

I cannot possibly find in this transaction any basis for the position that there was a sale or issue of bonds at a discount and I must hold accordingly.

The foregoing memorandum will constitute the Court's Findings of Fact and Conclusions of Law and an order dismissing the actions of the plaintiff will be entered, copies of which counsel will shortly receive.