**NASSAU LENS CO., Inc., Petitioner,**
v.
**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**
v.
**Harry PILDES and Sarah Pildes, Respondents.**

No. 309, Docket 26946.

United States Court of Appeals
Second Circuit.

Argued May 23, 1961.

Decided Sept. 17, 1962.

Bernard Jaffe, New York City (Axelrod & Jaffe) New York City, on the brief (Raymond Rubin, New York City, of counsel), for petitioner, Nassau Lens Co., Inc. and respondents, Harry Pildes and Sarah Pildes.

Harvey G. Schneider, Atty., Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and Joseph Kovner, Attys., De-

partment of Justice, Washington, D. C., on the brief), for the Commissioner.

Before LUMBARD, Chief Judge, and SMITH and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge.

Both the Commissioner and the corporate taxpayer (Nassau) have petitioned for review of a Tax Court decision holding that a deficiency asserted against the corporation was properly determined.[1] 35 T.C. 268 (1960).

In reaching its determination, the Tax Court made findings of fact. It found that Harry Pildes and his wife, Sarah Pildes, are residents of Brooklyn, New York. For a period of years prior to 1954 Harry Pildes operated two businesses as sole proprietorships: Pildes Company was a retail dispensing optician and Nassau Lens Company was a wholesale dealer in lenses and optical equipment.

On January 3, 1954, Nassau Lens Co., Inc., hereinafter referred to as Nassau, was organized as a New York corporation to take over the business of Nassau Lens Company, and Harry Pildes, as hereinafter described, became the sole stockholder of the corporation. Nassau filed its corporate income tax return for 1954, on an accrual basis, with the district director for the Lower Manhattan District of New York; Harry Pildes and Sarah Pildes filed their joint income tax return for 1954, also on an accrual basis, with the district director in Brooklyn.

On January 6, 1954, Harry Pildes made a formal written offer to Nassau suggesting the transfer of all of the assets of the predecessor proprietorship to Nassau and the acquisition of all of is securities (stock and debenture notes) by Harry Pildes. The offer was promptly accepted by Nassau's board of directors. The transaction was consummated by the actual transfer of the assets to Nassau, which in turn issued its stock and debenture notes to Harry Pildes in accordance with the foregoing offer.

The balance sheet of the predecessor proprietorship as of December 31, 1953, was as follows:

### ASSETS

| | | |
|---|---:|---:|
| Cash on Hand | | $     10.00 |
| Cash—Marine Midland Bank | | 18,517.54 |
| Cash—Corn Exchange Bank | | 3,612.22 |
| Accounts Receivable | | 40,173.40 |
| Security and Deposits | | 10.00 |
| Merchandise Inventory—December 31, 1953 | | 160,752.74 |
| Auto Equipment | $2,767.55 | |
| Reserve for Deprec. | 230.63 | 2,536.92 |
| Furniture and Fixtures | $7,069.38 | |
| Reserve for Deprec. | 1,943.14 | 5,126.24 |
| Total Assets | | $230,739.06 |

### LIABILITIES AND CAPITAL

| | |
|---|---:|
| Accounts Payable | $ 35,318.92 |
| Sales Taxes Accrued | 1,788.80 |
| Taxes and Expenses Accrued | 532.28 |
| Total Liabilities | $ 37,640.00 |
| Net Worth—December 31, 1953 | 193,099.06 |
| Total Liabilities and Capital | $230,739.06 |

1. Our jurisdiction is based on 26 U.S.C.A. § 7482.

The Tax Court found no evidence that there was any change in any item in the balance sheet prior to the transfer of assets to the corporation. It also found that all of such assets were in fact so transferred, and that the inventory item was based upon a physical count and represented an accurate reflection of fair market value.

Harry's offer of January 6, 1954 divided the assets into three parts as follows:

"(a) I hereby offer to purchase all of the authorized stock of your corporation consisting of fifty (50) shares of Class A and one hundred fifty (150) shares of Class B, for a total consideration of $70,000.00. The said consideration of $70,000.00 shall be made up by transferring to you all of the assets of the Nassau Lens Co., listed on the attached balance sheet, except for the item of merchandise inventory. The total of the items so to be transferred is $69,986.32; the balance of $13.68 of the purchase price, I agree to contribute to the corporation in cash.

"(b) I hereby offer to sell to the corporation, at cost, the inventory shown on the annexed balance sheet to the extent of $100,000.00 thereof, and offer to accept in payment, in lieu of cash, one hundred (100) registered debenture notes issued by your corporation, each with an issuance value of $1,000.00, and providing that on January 7th, 1964, your corporation shall pay to the registered holder thereof upon its presentation, the sum of $1,500.00. Said debenture notes shall further provide that your corporation shall have the right to redeem the same at any time upon thirty (30) days written notice to the registered holder thereof upon payment of the following amounts if redeemed within

| First Year | after Issue | .............................. | $1,040 |
| Second Year | " " | .............................. | $1,080 |
| Third Year | " " | .............................. | $1,125 |
| Fourth Year | " " | .............................. | $1,170 |
| Fifth Year | " " | .............................. | $1,220 |
| Sixth Year | " " | .............................. | $1,270 |
| Seventh Year | " " | .............................. | $1,325 |
| Eighth Year | " " | .............................. | $1,380 |
| Ninth Year | " " | .............................. | $1,440 |
| Tenth Year | " " | To Maturity .................. | $1,500 |

In addition, said debenture notes shall further contain the usual provisions stated in instruments of that kind and nature.

"(c) I offer to transfer to your corporation the balance of the said inventory shown on the annexed statement (amounting to $60,752.-74) upon your agreement to assume and pay all of the obligations and liabilities now remaining outstanding, incurred by me in the operation of the said Nassau Lens Co., except liability for my own income taxes, and to fulfill all commitments incurred to date in the regular course of business in Nassau Lens Co. Your obligations hereunder shall include assumption of all liabilities reflected in the annexed balance sheet, liability on the lease for the premises now occupied by the business, and any other liabilities which may be imposed upon the said business, provided, however, that the total obligations assumed by you under this paragraph shall in no case exceed the amount of $60,752.74. Any excess of the $60,752.74 in inventory transferred pursuant to this para-

graph over liabilities assumed by you, shall be retained by your corporation as paid in surplus."

The various steps outlined in the offer were formally carried out. All of the assets on the balance sheet were in fact transferred to Nassau, and Nassau assumed the liabilities of the proprietorship and issued its stock and debenture notes to Harry Pildes. The liabilities were stated to be $37,640, and on its balance sheet Nassau treated as paid-in surplus $23,112.74 of the transferred assets not allocated to any other item. On January 7, 1954, the 100 registered debenture notes, which by their terms were transferable on the books of the corporation only, were issued to Harry Pildes. Nassau was required to pay the registered holder $1,500 for each note (i. e., an aggregate of $150,000) on January 7, 1964, and the notes were redeemable prior to maturity at Nassau's election in accordance with the schedule in the offer. However, the registered holder had no right to call for redemption. No interest payments were provided for in the notes.

Nassau did not redeem any of the debenture notes during the taxable year 1954, and Harry Pildes did not receive cash during the taxable year by reason of the ownership of any of the debenture notes. In filing its 1954 corporate return, as the Tax Court said, "Nassau deducted the sum of $4,904.10 which it claimed for the period of January 7, 1954, to December 31, 1954, as the amortization of the original issue discount on the debenture notes. This discount was based on the difference between the value of the debenture notes at maturity and the alleged purchase price thereof." The Commissioner disallowed this deduction.

In filing their 1954 joint return, Harry and Sarah Pildes did not include any income based on ownership of the debenture notes. The Commissioner determined a deficiency against them for failure to include $4,000 of taxable income based on the increase in the redemption value of the 100 debenture notes. During all of 1954 Harry Pildes was the sole stockholder of Nassau. He served as its

president and his sister-in-law, Doris Philipson Press, was secretary-treasurer. The Board of Directors consisted of Harry, Doris, and Doris' husband, Lewis Press.

Upon these facts the Tax Court held:

" * * * Upon review of the evidence we agree with petitioners that the fair market value of the merchandise was equal to the amount appearing for that item on the balance sheet. However, we do not agree with petitioners that the transaction in question resulted in the creation of any amortizable discount.

"The entire transaction whereby Harry transferred the assets of his wholly owned wholesale lens business to his wholly owned corporation was entirely lacking in arms-length dealing. The allocations of (1) the non-inventory assets as consideration for Nassau's stock, (2) a portion of inventory as consideration for the debenture notes, and (3) the remaining inventory as consideration for Nassau's assumption of liabilities with the excess ($23,112.74) to be treated as paid-in surplus—all these were simply arbitrary component steps in a single transaction whereby Harry merely exchanged his wholesale lens business for a 100 per cent ownership and control of the corporation that was thereafter to carry on that business. No business reasons appear for the artificial division and allocation of the assets in question. We cannot say on this record that $100,000 of inventory was the true consideration for the $150,000 debenture notes, nor can we say on this record that such notes represented a bona fide indebtedness of Nassau.

"In Judge Kalodner's concurring views (joined by Judges Staley and Hastie) in Montana Power Company v. United States, 232 F.2d 541, 549–550 (C.A. 3), the opinion was expressed that where there is no arms-length dealing between the seller and

the purchasing corporation, no deduction is available in respect of discount allegedly inhering in the obligations of the purchasing corporation issued for assets transferred to it. We do not find it necessary to decide whether we should follow so sweeping a rule, for in the present case, not only was there an absence of arms-length dealing, but the record is lacking in convincing evidence that $100,000 in inventory was in fact the consideration for the debenture notes. The issuance of the notes was merely part of a more comprehensive transaction and the allocation of $100,000 in inventory therefor appears to be completely artificial. Why, for example, was $23,112.74 treated as paid-in surplus? And what business reasons, if any, dictated a division of business assets already wholly owned by Harry so that a portion thereof would be allocated to invested capital (stock) while another portion would be charged to borrowed capital (debenture notes)? Further, assuming that some such allocation was proper, what business reasons if any justified the allocations in the amounts which Harry undertook to make? The answers to these and other pertinent questions are not to be found in the record before us, and we cannot find that there was in fact any bona fide amortizable discount. Cf. Dodge Brothers Inc. v. United States, 118 F.2d 95 (C.A. 4); Arkansas-Missouri Power Corp. v. Paschal, 144 F.Supp. 272 (E.D. Ark.), affirmed, 243 F.2d 584 (C.A. 8), certiorari denied, 355 U.S. 835 [78 S.Ct. 57, 2 L.Ed.2d 47]. Accordingly, we hold that the deficiency against Nassau was properly determined. * * *"

Since the Tax Court determined that Nassau was not entitled to the discount deduction under the applicable regulation,[2] it found it unnecessary to decide whether, if the deduction was allowable, the individual taxpayers had additional income of $4,000 during 1954 because of the increase in the redemption value of the debentures. Nassau petitions for review of the action of the Tax Court in upholding the deficiency asserted against it. The Commissioner petitions for review of the determination as to the individual taxpayers in the event we allow the corporate deduction for amortization of the note discount. We remand on Nassau's petition and withhold decision on the Commissioner's pending the outcome on the remand.

■ At the outset we are met with the contention that an amortization deduction for bond discount is never available where the obligations are issued for property. The principal argument[3] in favor of such a conclusion has been stated as follows:

"When bonds issued are for property it is impossible to ascertain whether there will be a loss or gain until the property is sold, while when bonds are issued for cash 'loss' by way of added or deferred interest is immediately ascertainable.

"It is settled that when property is acquired by purchase the cost of the property is the measure of the investment. Bonds issued for property become invested capital, and since the income tax law is concerned only with realized losses and gains no taxable loss or gain occurs with respect to such capital until the property is sold." Montana Power Co. v. United States, 232 F.2d 541, 548–549 (3rd Cir. 1956) (concurring views).

---

2. § 1.61–12(c) (3) states in part:
   If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds. * * *

3. We do not believe the failure of the regulations explicitly to permit the issuance of bonds at a discount for property is conclusive.

It may well be true that to a "borrowing buyer" interest or discount payments seem part of the cost of the property. In reality, however, they are the cost of using the money which is needed to purchase the property, a cost not incurred by the buyer with ready cash. This distinction is clearly recognized by the Code, and we feel we must give effect to it. Surely a promise today to pay $150,000 in ten years is not presently worth $150,000 either in property or cash. And since the debentures here could be redeemed at various times for various amounts, the cost of the property could not be determined until the redemption and that might not occur until long after the property had been resold.[4] The contention asserted is merely that when a seller also becomes a financing medium by taking bonds issued at a discount instead of cash in exchange for property, the tax laws will not recognize a charge for the use of money. We find no support for such an assertion and reject it.[5] See American Smelting & Ref. Co. v. United States, 130 F.2d 883 (3rd Cir. 1942).

We come now to the principal issue raised by the case, that being the extent to which the sole stockholder of a corporation is free for tax purposes to allocate his investment between debt and equity. The Tax Court's decision on this point was to the effect that debt, and the resultant interest and discount deductions, would not be recognized for tax purposes unless a "business purpose" was shown to justify the allocation.[6] The rationale behind this broad rule seems to be that since, under these circumstances, the stockholder could allocate the entire investment to equity without adverse business consequences, a different allocation producing less tax revenue will not be allowed. In effect, the Court held that if the allocation was the result solely of a desire to save taxes, it would be reallocated for tax purposes so as to produce the maximum revenue.[7]

The question of whether the legal form of a transaction adopted by a taxpayer controls the tax consequences or whether the form is to be ignored and the transaction treated as something quite different is not unique. It has been raised many times and is the subject of many judicial decisions. Long strings of citations, however, are of little aid since each case turns upon the particular facts involved. Nonetheless, some guides are available. In the absence of statutory language or legislative history to the contrary, the desire to save taxes is not by itself sufficient cause to disregard the form adopted by the taxpayer, for "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596. While the taxpayer may of course show he had a motive other than tax saving in adopting a particular form, his case may also be based upon a demonstration "that his treatment of the transaction does not conflict with the meaning the Congress had in mind when it formulated the section *sub judice*." Gilbert v. Commissioner, 248 F.2d 399, 406 (2nd Cir. 1957). In short, the courts have not attributed to Congress a general purpose underlying the entire Code to deprive the taxpayer in each case of freedom to choose between legal forms similar in a

---

4. See opinion of Chief Judge Biggs, dissenting in part and concurring in part, in Montana Power Co. v. United States, supra, at 550.

5. The fact that the value of property is more uncertain than the value of cash is far too thin a reed to support the Commissioner's contention.

6. We are assuming *arguendo* that there was in fact no business purpose behind the allocation here. The taxpayer will be free, however, to present evidence on this point upon the remand. See note 12 infra and accompanying text.

7. In fact, the Court's holding is one step removed since the tax motive is apparently inferred from the lack of a business purpose.

broad economic sense but having disparate tax consequences.[8] Kraft Foods Co. v. Commissioner, 232 F.2d 118 (2nd Cir. 1956). They have, instead, when confronted with a statutory provision not explicitly turning on the relationship between parties to a transaction[9] or requiring an underlying business purpose, adopted a cautious approach and asked merely whether the form superimposed upon the transaction has a result similar to the one Congress had in mind when it drafted the section involved.

Two examples will illustrate the principle involved. In Gregory v. Helvering, supra, the Court found the transaction to be no more than an elaborately contrived conveyance posing as a reorganization. The critical factor was not only the existence of a tax motive or lack of a "business purpose" but also the incongruity of the tangible, observable result of the transaction when viewed in light of the congressional purpose underlying the reorganization provisions. Having found a lack of a business purpose *and* a disparity between the objective result and the ascertainable legislative purpose, the Court could proceed to tax the transaction with assurance. Similarly, in a more recent case, Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L. Ed.2d 128, the Court found that a transaction did not result in "indebtedness" within the meaning of the tax laws. But that transaction was one which, when viewed apart from the desired tax consequences, could not result in a gain to the taxpayer.[10] And, again, even though the tax motive was undoubtedly present, and a critical factor, the Court could certainly find that Con-

gress, when drafting the particular sections, was concerned only with transactions entered into with some hope of profit apart from tax savings and not with transparent schemes objectively demonstrated to be ridiculous business propositions.[11] In short, while the existence of a tax motive or the lack of a business purpose is the starting point for a challenge to the form of a transaction adopted by a taxpayer, it is, in the absence of legislative intent to the contrary, not the finish line, for if the substantive result is of the general type considered by Congress to be within the particular provisions involved, the fact that a different but equally feasible form would have resulted in a greater tax is of no consequence. And since legislative intent must oftentimes be unclear, the form adopted will usually be recognized except where it is a patent distortion of normal business practice, as it was in Gregory and Knetsch.

A cautious approach in this particular area of tax law is not entirely unjustified. To have each case turn solely on the existence or lack of a business purpose might ultimately involve the courts in inquiries as to what is a justifying business purpose and what is not. And since a law taxing a practice is often little different from a law prohibiting it, the result might be a degree of *ad hoc* judicial regulation of business practices without legislative guidance. It must be conceded, however, that this danger, although real, can be overstated. But there is yet another justification for a cautious approach. The well-spring of tax policy is Congress, not the federal courts. In the long run, the judicial gloss imposed

---

8. We find it unnecessary to discuss the cases cited by the Tax Court in support of its conclusion. E. g., Arkansas-Missouri Power Corp. v. Paschal, 144 F. Supp. 272 (E.D.Ark.1956), aff'd 243 F.2d 584 (8th Cir. 1957). The rationale adopted by the Tax Court, whether or not supported by the cases cited, has been foreclosed in this Circuit for some time. Gilbert v. Commissioner, supra; Kraft Foods Co. v. Commissioner, supra.

9. E. g., 26 U.S.C.A. § 267.

10. The artificiality of the transaction was sharply demonstrated by the fact that the potential "business" losses could never exceed the tax benefits since the notes involved were nonrecourse.

11. The Court itself explicitly limited the importance of motive when it "put aside" the lower court's finding as to the taxpayer's purpose in effectuating the transaction in question. 364 U.S. at 365, 81 S.Ct. at 134, 5 L.Ed.2d 128.

upon the Code must be derived from the congressional purpose underlying the provisions involved in each case. And to the extent the Code grows in complexity and detail, the courts must be careful not to attribute to Congress overall purposes or meanings not reflected in the statutory language or clearly demonstrated in the legislative history. E. g., Commissioner v. Estate of Canfield, 306 F.2d 1 (2nd Cir. 1962), Braunstein v. Commissioner, 305 F.2d 949 (2nd Cir. 1962). The present case illustrates the problems involved. It is all very well to say that it makes little "economic" difference whether the investment here was divided between debt and equity or was entirely allocated to equity. But by the same reasoning it may make little "economic" difference to Pildes whether he has an unincorporated business or a corporation in which he is the sole stockholder. And if one wanted to carry the argument far enough, presumably the Commissioner would be free to make *ad hoc* attacks on a whole variety of transactions involving closely held corporations. But this Code does not so empower the Commissioner, for it recognizes and treats corporations as separate entities and affords significance to the type of investment chosen in them so long as that investment has substantial economic reality in terms of the objective factors which normally surround the type chosen. Kraft Foods Co. v. Commissioner, supra.

In short, we have held that non-arm's-length loans by a stockholder to a corporation are to be recognized or disregarded for tax purposes according to the extent to which they comply with arm's-length standards, not the extent to which the taxpayer has a business purpose.

Gilbert v. Commissioner, supra. There is "no rule which permits the Commissioner to dictate what portion of a corporation's operations shall be provided for by equity financing rather than by debt." Estate of Miller v. Commissioner, 239 F.2d 729, 734 (9th Cir. 1956), so long as the latter can be said to be debt in terms of substantial economic reality. We conclude, therefore, that the Tax Court applied an erroneous legal standard when it placed such emphasis on Pildes' lack of a business purpose. The Tax Court also concluded, however, that it could not find that the "notes represented a bona fide indebtedness of Nassau." But, although it reached this conclusion, it did not assign the reasons therefor, and we must remand for further findings. Gilbert v. Commissioner, supra. Because the questions of whether the debentures created a true indebtedness or were bottomed upon a business purpose were not raised by the Commissioner in asserting the deficiency,[12] both parties are free to introduce evidence relevant to these issues on the remand. The effect of this omission upon such matters as the burden of proof should also be considered by the Tax Court.

Upon remand the first question for determination is whether Pildes did in fact create a debt. If the Tax Court finds that a valid debt was created, then the next question is whether it should be treated as debt for the purpose of taxation. This depends on whether the creation of the debt had a result similar to the one Congress had in mind when it drafted the statute involved, or if the intent is unclear, whether there is a patent distortion of normal business practice. The standards to be applied have

12. During the proceedings, counsel for the Commissioner asserted the following as his contentions in the "Nassau" case:

(1) That Section 267 barred the deduction (Abandoned on appeal).

(2) That the regulations allowing amortization of bond discounts do not apply where assets are transferred for the bonds (Rejected by this Court).

(3) That the fair market value of the assets transferred was not equal to the amount appearing for that item on the balance sheet (Rejected by the Tax Court and not appealed).

(4) That the discount regulations do not apply where there is no arm's-length transaction (Rejected by this Court).

The Tax Court itself raised the questions as to whether a business purpose existed and whether the indebtedness was bona fide.

been extensively discussed in other decisions of this Court,[13] and need be mentioned only briefly here. The starting point is, of course, whether there is an intent to repay, for in the absence of that no debt can be said to exist. Cf. Gooding Amusement Co. v. Commissioner, 236 F.2d 159 (6th Cir. 1956). Other factors to be considered relate to the extent to which the debentures bear a substantial risk of the enterprise and, like risk capital, are tied up indefinitely with the success of the venture. Camp Wolters Enterprises, Inc. v. Commissioner, 230 F.2d 555 (5th Cir. 1956). Relevant considerations are whether the debt instruments are subordinate to those held by outsiders or whether they specify a relatively fixed date upon which the creditor may demand a definite sum regardless of the profits earned. Ibid.; Farley Realty Corp. v. Commissioner, 279 F.2d 701 (2nd Cir. 1960); Jewel Tea Co. v. United States, 90 F.2d 451, 112 A.L.R. 182 (2nd Cir. 1937). The Tax Court should also give consideration to the debt-equity ratio and the question of whether outside investors would have made similar advances. Gilbert v. Commissioner, supra. And, although the usual question relates to whether the debt is too risky, the Court may also consider whether the loan is not risky enough in the sense that the interest or discount sought to be deducted is substantially higher than the going market rate for loans of the kind involved. Dodge Bros. Inc. v. United States, 118 F.2d 95 (4th Cir. 1941). In such a case, a court might well determine the distorted interest or discount rate is, in terms of substantial economic reality, a dividend.

Tax savings motives are, of course, not irrelevant and may be considered by the Tax Court. They may not, however, be given conclusive effect but should be given weight commensurate with the extent to which "they contribute to an understanding of the external facts of the situation." Gilbert v. Commissioner, supra, 248 F.2d at 407. In short, a departure from normal business patterns combined with a tax avoidance motive usually will be sufficient to justify treating the "loan" as equity. Either factor alone, however, is not enough.

Our disposition of the case makes it unnecessary to decide at this time whether, if the discount deduction is allowed, the individual taxpayers had additional income. The case is remanded to the Tax Court for proceedings consistent with this opinion.

13. E. g., Gilbert v. Commissioner, supra; Kraft Foods Co. v. Commissioner, supra.