The **ATCHISON, TOPEKA AND SANTA FE RAILROAD COMPANY**, Plaintiff-Appellee,

v.

The **UNITED STATES** of America, Defendant-Appellant.

No. 355–70.

United States Court of Appeals, Tenth Circuit.

May 24, 1971.

William L. Goldman, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, Gilbert E. Andrews, Grant Wiprud, Attys., Dept. of Justice, Washington, D. C., on the brief, Robert J. Roth, U. S. Atty., of counsel), for defendant-appellant.

John J. Schmidt, Chicago, Ill., (Gus Svolos, John P. Frestel, Jr., Orval M. Adam, Chicago, Ill., on the brief, J. D. Lysaught, Weeks, Thomas, Lysaught, Bingham & Johnson, Kansas City, Kan., of counsel, Douglas McHendrie, Grant, Shafroth, Toll & McHendrie, Denver, Colo., of counsel), for plaintiff-appellee.

Before SETH, ADAMS,* and McWILLIAMS, Circuit Judges.

ADAMS, Circuit Judge.

Following the financial panic of 1893, more than one-fourth of the nation's railroads were in receivership. Among the enterprises experiencing difficulty was the Atchison, Topeka and Santa Fe Railroad Co. ("Old Company"). On December 23, 1893, the Union Trust Company of New York, trustee under the first and second mortgage bonds of the Old Company, filed a complaint in the United States Circuit Court for the District of Kansas, requesting the appointment of a receiver for the properties of the Old Company. The president and general counsel of the Old Company and the Clerk of the Circuit Court were appointed. On January 1, 1894, the Old Company defaulted in payment of interest on its general mortgage bonds. The Union Trust Company filed a second complaint on March 12, 1894 seeking foreclosure of the mortgages and sale of the railroad's property described in the mortgages. A reorganization took place in 1895 whereby the Atchison, Topeka and Santa Fe Railway Co. ("New Company")—the present plaintiff and taxpayer—acquired all the assets of the Old Company.

In the course of the reorganization, the New Company issued bonds which form the basis of the dispute in this income tax refund suit. The general problem presented is whether the New Company incurred amortizable original issue discount in issuing these bonds, and the specific question on this appeal is whether the Government was entitled to a directed verdict that no discount was incurred when the New Company issued its bonds in 1895.

After a trial before a jury and the Honorable Arthur J. Stanley, Jr., then Chief Judge of the United States Dis-

* Of the Third Circuit, sitting by designation.

trict Court for the District of Kansas, the jury returned a verdict for the taxpayer, and the Government appealed.

So far as the stipulated facts reveal, the events of 1893 to 1895 crucial to this case are as follows. After the filing of the first complaint by the Union Trust Company in 1893, bondholder protective committees were quickly formed throughout the country. The stockholders later established the Atchison Protective Reorganization Committee to protect their interests. Following various negotiations, three of the existing bondholder committees created the Joint Executive Reorganization Committee. After negotiating at arm's length with the other groups of interested security holders, the Joint Executive Committee formulated and proposed a plan of reorganization for the Old Company which was finally approved on April 10, 1895. It proposed the foreclosure of the general mortgage, also referred to as the first mortgage, and the vesting of the properties acquired at the foreclosure sale into the New Company. The following table was appended to the Plan and Agreement for Reorganization. It shows the contemplated destiny of the securities of the New Company in relationship to those in the Old Company.

TABLE OF EXISTING SECURITIES AND SECURITIES PROPOSED TO BE ISSUED BY THE NEW COMPANY.

| EXISTING ISSUES | PRINCIPAL | FIXED INTEREST | PROPOSED ISSUES | PRINCIPAL | FIXED INTEREST |
|---|---|---|---|---|---|
| Chicago and St. Louis R. R. 1st Mtg. ......... 6's | $1,500,000.00 | $90,000.00 | Chicago and St. Louis R. R. 1st Mtg. ...... 6's | $1,500,000.00 | $90,000.00 |
| Guarantee Fund Notes ........ 6's | 9,000,000.00 | 540,000.00 | | | |
| Equipment Trust, Series "A" .... 5's | 1,750,000.00 | 87,500.00 | Prior Lien Bonds (if exchanged) .. ........... 4's | 12,020,414.00 | 480,816.56 |
| Equipment Lease Warrants ........ | 1,270,414.00 | ........ | | | |
| Misc. Unconverted Bonds | 1,562,950.00 | 78,107.50 | Misc. Bonds | 1,562,950.00 | 78,107.50 |
| General Mortgage ............. 4's | 129,320,776.54 | 5,172,831.06 | Gen. Mtg. (75% of old Gen'ls) ..... 4's | 96,990,582.00 | 3,879,623.00 |
| | | | 4% Adjustment Bonds (40% of old Gen'ls) (Cumulative after 1st July, 1900.) | 51,728,310.61 | |
| Second Mortgage "A" ......... 4's | 77,937,500.00 | 3,117,500.00 | | | |
| Second Mortgage "B" ......... 4's | 10,000,000.00 | 400,000.00 | 5% Non-Cumulative Preferred Stock ... | 111,485,951.00 | |
| Income Bonds (exchangeable for A's) ............ | 1,253,607.20 | 50,144.29 | | | |
| Capital Stock | 102,000,000.00 | ........ | Common Stock | 102,000,000.00 | |
| Existing Fixed Charges | ............. | $9,586,082.85 | Proposed Fixed Charges | ............. | $4,528,547.06 |

Specifically, the general mortgage bondholders, the second mortgage bondholders, the income bondholders and the stockholders placed their securities in various depositories and received in exchange certificates of deposit. In addition to their securities, holders of the second mortgage bonds, the income bonds and common stock were required to pay a cash assessment—totaling nearly $14,-000,000—into the depository in order to be eligible to receive certificates of deposit and to participate in the Plan. The security holders never reduced their

claims against the Old Company to ownership of its properties, but rather exchanged their old securities for new ones.

On August 27, 1895 the Union Trust Company filed a supplemental complaint in the Circuit Court requesting that the properties of the Old Company be sold as a single parcel. The Joint Executive Committee was allowed by the Court to intervene in the reorganization proceedings, requested the Union Trust Company to go forward with the sale, and the Court so ordered. A special master sold the property for $60,000,000 at public auction on December 10, 1895 to Edward King, President of the Union Trust Company, Victor Marawetz and Charles Beeman, all representing the Joint Executive Committee. The Court approved the sale on the same day, decreeing that the purchasers could transfer the property to a new corporation, subject to certain restrictions including provision for paying certain general mortgage bondholders of the Old Company who had elected not to participate in the Plan.

The next day, December 11, 1895, the property was deeded to the three men. On December 12, 1895 the Joint Executive Committee incorporated the New Company, and the three men deeded the properties to it. The purchase price recited in the deed was $382,202,500, payable as follows: $96,990,500 par value of the New Company's general mortgage bonds, $51,728,000 par value of the New Company's adjustment mortgage bonds, $131,486,000 par value of the New Company's preferred stock [1] and 1,019,980 shares ($101,998,000 par value) of the New Company's common stock. The New Company delivered these securities to the Joint Executive Committee which placed them in the Union Trust Company. The Trust Company eventually effected the exchange of the old certificates of deposit for the securities of the New Company.

In the trial court, the New Company argued that it issued its general mortgage and adjustment bonds in exchange for the *intangible claims* of the general mortgage bondholders of the Old Company, that the fair inherent value of such claims was less than the par value of taxpayer's bonds issued in exchange therefor, and that such difference constitutes discount amortizable for federal income tax purposes. The Government contended that, as a matter of law, the securities of the New Company were exchanged for the *assets* of the Old Company, and since the deed recited a purchase price equal to the par value of the securities being issued, no discount arose. Alternatively, the Government argued that when bonds are exchanged for property of any kind, absent an accompanying document specifying the amount of bargained-for interest, then, as a matter of law, no interest may be imputed.

Chief Judge Stanley ruled that in substance the New Company's bonds were exchanged for those of the Old Company, and submitted to the jury the questions whether the fair market value of the bonds received was less than the par value of the bonds paid, and whether such difference constituted amortizable bond discount. The jury found a difference of $56,480,548 in the exchange and decided that such amount constituted original issue discount.[2] The Government did not seek to submit the central question in this litigation—namely, the nature of the transaction: bonds for bonds or bonds for property—to the jury. Instead, the Government sought a legal ruling excluding the possibility of finding a bonds-for-bonds exchange. Since the Government also contends no discount can arise in any bonds-for-property

---

1. Under the table attached to the Plan and Agreement, this figure was to be $111,485,951. The other figures recited in the deed reflect the amount of old securities actually deposited for participation in the reorganization.

2. The New Company's refund claim in this suit was with respect to its 1950 income tax return. At oral argument, counsel for the New Company stated that the matter had been disposed of in prior years by negotiation and conferences with the Internal Revenue Service. Because the term of the bonds is 100 years and the amount of the bonds outstanding in 1950 was $55,839,275, taxpayer claimed a deduction of $558,392.75.

transaction (absent a specific agreement) it has not asked this Court for a new trial. Accordingly, the sole issue before us is whether the trial court erred in refusing to direct a verdict for the Government.[3]

Because this suit involves the New Company's 1950 income tax return, § 29.22(a)–17(c) (1) of the income tax regulations under the Internal Revenue Code of 1939 provides the authority for the deduction sought here:

> "If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds."

This regulation does not distinguish between bonds issued for cash and bonds issued for property. Rather, the regulation recognizes *sub silentio* the economic possibility that discount—that is, deferred interest—may be present when bonds are issued in exchange for property as well as for cash. Such discount is likely to arise when the stated rate of interest on the obligation is less than the rate demanded by the market. American Smelting and Refining Co. v. United States, 130 F.2d 883 (3rd Cir. 1942).

■ ■ The Government's first argument is that as a matter of law taxpayer's bonds were issued in partial payment of the negotiated and agreed purchase price for the assets of the Old Company, in substance as well as in form, and therefore no discount was incurred. It is true that the mechanics of an insolvency reorganization ordinarily involve a purchase of the old company's assets by the new company. See e. g., Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775 (1942); Southern Natural Gas Co. v. United States, 412 F.2d 1222, 1235–1236, 188 Ct.Cl. 302 (1969). In fact, in this case a deed was executed which recited that the three persons who bought the Old Company's property at the fore-

closure sale sold that property to the New Company for $382,202,500, partly payable in the general mortgage and adjustment bonds now at issue. However, we do not regard the deed as a conclusively controlling document for the purposes of this case. For the deed did not represent a bargained-for exchange between the New Company and the sellers. The sellers merely represented the Joint Executive Committee at the foreclosure sale; the New Company was nothing but the creature of the Joint Executive Committee which was responsible for its incorporation. According to the stipulated facts, the arm's-length bargaining had already occurred and was between the various classes of security holders. The formal conveyance of title was only an intermediate step in the reorganization as reflected in the Plan and Agreement approved by the court. The essential agreement marking the first and last steps was that among the security holders concerning what they should receive from the New Company for giving up their intangible claims against the Old Company. The Government replies that whatever exchange went on at the security-holder level after the securities were transmitted to the Joint Executive Committee is irrelevant to the taxpayer corporation. But we believe that especially in reorganization cases the end result of the series of interrelated steps controls the tax consequences of the whole. *Cf.* Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); Helvering v. Elkhorn Coal Co., 95 F.2d 732 (4th Cir. 1938). The result sought here was to relieve the business enterprise of part of its first lien indebtedness and to reduce the amount of fixed interest payable each year in cash. To induce the bondholders to release their claims, a bonus was paid by issuing to each holder securities in a larger face amount than those surrendered. That result was not altered by effecting the change in the composition of the securities by means of a foreclosure

---

3. At oral argument the Government reiterated that it was not seeking a new trial in this case, but is asking for re-

versal and entry of judgment in its favor.

sale of the Old Company's property rather than by a more direct securities-for-securities exchange. The Government is correct in arguing that this case is like New York, C. & St. L. Co. v. Burnet, 62 App.D.C. 29, 64 F.2d 152 (1933) where no discount was found. However, that case arose before the step-transaction doctrine became established, and equally important the court there found no evidence in the record which would support a finding that the bonds were issued at a discount. The record in Ambassador Hotel Co. of Los Angeles v. Commissioner, 23 T.C. 163, 168 (1954), also cited by the Government, suffered from a similar deficiency. In contrast, the record here amply supports the jury's verdict that the New Company's bonds were issued at a discount.

■ The Government further argues that such cases as Hamlin's Trust v. Commissioner of Internal Revenue, 209 F.2d 761, 765 (10th Cir. 1954), holding that parties to a contract with competing income tax interests "are not at liberty to say that such was not the substance and reality of the transaction," should apply here. But there were no competing income tax interests between the bondholders and the New Company in 1895, nor could the parties have negotiated concerning such interests as they could have done in *Hamlin's Trust* and Commissioner of Internal Revenue v. Danielson, 378 F.2d 771 (3rd Cir. 1967). Had this reorganization occurred after 1913, the taxpayer might well have a significantly heavier burden to demonstrate its view of the substance of the transaction.[4] We therefore hold that the Government was not entitled to a ruling from the District Court that the transaction here, as a matter of law, constituted in substance a bonds-for-property exchange.

■ The Government's alternative contention is that even assuming the bonds of the New Company were in es-

sence exchanged for the bonds of the Old Company, no discount arose because none may be imputed where discount is not specified in a bonds-for-property exchange. In support of this contention, the Government maintains that taxpayer will recover the "full amount of its undertaking to the bondholders" through depreciating the property it received. However, taxpayer's basis in the railroad property was not determined by reference to any purchase price, but was calculated according to its fair market value as of 1913 for purposes of the Income Tax Act of 1913, c. 16, 38 Stat. 114, 166 and subsequent revenue acts. *See e. g.* § 113(a) (14) of the 1939 Code. Moreover, the depreciation deduction serves a wholly separate function from, and is in addition to, the interest deduction. Clearly the taxpayer would have been entitled to a deduction for discount had the bonds been sold on the market at a discount, and the proceeds used to purchase the assets of the Old Company.

■ The Government also argues that administrative inconvenience requires that the parties not be able to show discount in a bonds-for-property exchange, and further contends that the Commissioner conceivably could be "whipsawed" by the competing tax interests of the parties. But this competition is already present in other areas of the income tax laws, such as alimony and child support payments, and does not appear to us a sufficient reason to preclude parties from sharing a discount on a bonds-for-property situation where all other necessary elements are present.

Perhaps the strongest authority the Government cites for its argument that discount may not arise in a bonds-for-property transaction is the analysis in an opinion by Judge Kalodner, joined by Judge Staley, in Montana Power Co. v. United States, 232 F.2d 541, 545 (3rd Cir. 1956), in which the other five mem-

---

4. This consideration of competing tax interests of the parties is an important factor in the "imputed interest" cases cited by the Government where courts hold no discount arises when bonds equal in face amount to the agreed purchase price of property are issued in payment of the price. E. g. United States v. Cornish, 349 F.2d 175 (9th Cir. 1965) ; Paine v. Commissioner of Internal Revenue, 236 F.2d 398 (8th Cir. 1956).

bers of the Court sitting *en banc* did not join. Upon reviewing the history and rationale of the Regulation authorizing the deduction for bond discount and cases considering the Regulation, Judge Kalodner concluded that the Regulation was never intended to be applicable in a bonds-for-property transaction. The position expressed by Judge Kalodner was adopted by the Court of Claims in Montana Power Co. v. United States, 159 F. Supp. 593, 141 Ct.Cl. 620 (1958).[5] However, the contrary view of Judge Goodrich in American Smelting & Refining Co. v. United States, 130 F.2d 883, 885 (3rd Cir. 1942) is more persuasive: "We believe that the discount is still to be treated as additional interest when the subject matter of the loan is stock instead of cash." *Accord*, Nassau Lens Co. v. Commissioner of Internal Revenue, 308 F.2d 39, 44 (2nd Cir. 1962); Industrial Development Corp. v. United States, 51 A.F.T.R. 1514 (N.D.Ill.1966); Southern Fertilizer & Chem. Co. v. Edwards, 167 F.Supp. 879 (M.D.Ga.1955).[6]

This view conforms with economic and business reality which recognizes that to the issuer bond interest is reflected both by the stated rate of interest and by the amount below or above par received by the issuer when the bonds are originally distributed. The taxpayer in this case presented substantial evidence from experts in railroad securities and properties who relied on the documents surrounding the reorganization, market conditions and actual trading, and valuation of the railroad properties as establishing the economic basis for and probable existence of discount. These facts merely

reinforce our view that the Government's argument on the law is unsound, and that the jury's verdict is well supported.

Accordingly, the judgment of the District Court will be affirmed.

---

5. But compare Erie Lackawanna R.R. v. United States, 422 F.2d 425, 430, 190 Ct.Cl. 682 (1970) and Missouri Pacific R.R. v. United States, 427 F.2d 727, 731 (Ct.Cl.1970).

6. *See also* D. Herwitz, Business Planning 506–509 (1966); 7 Mertens Law of Federal Income Tax § 38.55 (Zimet and Barton Rev.1967); R. Malloy, Federal Income Tax Aspects of New Trends in Railroad Corporation Finance, 12 Tax. L.Rev. 113, 122–138 (1957). It is of some interest that the Internal Revenue Service early ruled that discount could arise in a bonds-for-property exchange. O.D. 959, 4 Cum.Bull. 129 (1921) declared obsolete in Rev.Rul. 68–575, 1968–2 Cum.Bull. 603.