**NATIONAL ALFALFA DEHYDRATING AND MILLING COMPANY,
Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 72–1125.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Sept. 13, 1972.

Decided Jan. 26, 1973.

10. *Id.* at 640–641.

Charles White Hess, Kansas City, Mo. (Ronald B. Stang and Linde, Thomson, Van Dyke, Fairchild & Langworthy, Kansas City, Mo., on the briefs), for petitioner-appellant.

Ernest J. Brown, Atty., Dept. of Justice (Scott P. Crampton, Asst. Atty. Gen., and Meyer Rothwacks, Atty., Dept. of Justice, on the brief), for respondent-appellee.

Stuart S. Opotowsky, General Tax Counsel, Alan D. Berlin, New York City, Walter J. Rockler, Julius M. Greisman, Richard L. Hubbard, and Arnold & Porter, Washington, D. C., of counsel, on the brief for Norton Simon, Inc., amicus curiae.

Before PHILLIPS, HILL and HOLLOWAY, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

National Alfalfa Dehydrating and Milling Company, hereinafter called National Alfalfa, was incorporated under the laws of Delaware on May 4, 1946. It was authorized to engage and did engage in the business of dehydrating and milling alfalfa.

The question presented in this case is whether National Alfalfa incurred amortizable and deductible bond issue discount, deductible as interest paid, when it issued its 18-year, five per cent, sinking fund debenture bonds, hereinafter referred to as debentures, each for the principal sum of $50, to the preferred stockholders in exchange for their preferred stock, on the basis of one $50 debenture for each share of preferred stock of the par value of $50, when at the date of the exchange the fair market value of the preferred stock was only $33 per share.

Prior to July 23, 1957, National Alfalfa had issued an outstanding 47,059 shares of $50 par value, five per cent, cumulative preferred stock in an aggregate par value amount of $2,352,950, and as of that date there was a dividend arrearage on each of such shares of $10. Such preferred shares were redeemable at the discretion of National Alfalfa, in whole or in part, at prices ranging from $53 per share for shares redeemed prior to December 1, 1949, to $51 per share for shares redeemed after December 1, 1955, plus accumulated and unpaid dividends down to the date of redemption.

When redeemed, such preferred shares could not be reissued by National Alfalfa, but had to be cancelled and retired by it.

National Alfalfa was required to set aside annually after September 1, 1948, 20 per cent of its consolidated net earnings, after a payment of accrued dividends on its outstanding preferred stock, for the purpose of redeeming preferred shares, as long as any were outstanding. However, such preferred shares could not be redeemed with funds in the sinking fund, nor purchased or acquired for value by National Alfalfa at any time when there were dividend arrearages thereon, unless consented to by the holders of 50 per cent of the preferred shares, or unless National Alfalfa notified all of its preferred shareholders of its desire to purchase such shares and invited them to tender offers.

On April 8, 1957, the Board of Directors of National Alfalfa adopted several resolutions, which are set out in Note 1 hereto.[1]

1. The text of the resolutions is as follows:

"RESOLVED, that the officers of the Company, be and they are hereby authorized to effectuate a reorganization of the Company by way of recapitalization, and

"RESOLVED, that the President or Vice-President and the Secretary or Assistant Secretary of the Company be and they are hereby authorized to enter into a trust indenture with Fidelity-Philadelphia Trust Company of Philadelphia, Pennsylvania, dated, as of July 1, 1957, pursuant to the terms of which there shall be issued $2,352,950.00 principal amount 5% Debentures, due July 1, 1975, which said bonds shall be issued in exchange for shares of the 5% Cumulative Preferred Stock on the basis of $50.00 principal amount of such debentures for each share of preferred stock and that this resolution, when ratified by the shareholders shall constitute authority for said issue, and

"RESOLVED, that the Company be authorized to issue warrants for the purchase of the common stock of the Company to each preferred shareholder participating in the exchange of his preferred stock for Debentures of the Company in the reorganization effective August 1, 1957, on the basis of one warrant for each share of Preferred Stock surrendered, said warrants to evidence the right to purchase one-half (½) share of common stock and said warrants to be exercisable to purchase only full shares of common stock of the Company at a price of $10.00 per share at any time from the date of issue until July 1, 1969 or so long as any debenture bonds remain outstanding, after which date warrants will become void, and

"RESOLVED, that the Company increase the par value of its shares from $1.00 to $3.00 and that the amount of $1,580,000.00 be transferred from Paid-In-Capital to the Capital Account in order to effectuate this resolution and reflect the increase in par value of the Common Stock, and

"RESOLVED, that the Articles of Incorporation of the Company be amended by changing Article FOURTH to read as follows:

" 'The total number of shares of stock which the Corporation will have authority to issue is 1,000,000 shares of Common Stock of the par value of $3.-00 per share.

The minimum amount of capital with which the Corporation will commence business will be $1,000.00.'

"1. Each share of Common stock shall be entitled to one vote per share in any matter requiring a vote of shareholders and each share shall be entitled, upon any liquidation, dissolution, or winding up of the affairs of the Corporation, whether voluntary or involuntary, to participant pro-rata in the assets available for distribution.

"2. No holder of shares of stock of the Corporation shall be entitled, as such, to subscribe to or purchase any additional shares of stock, whether now or hereafter authorized, or obligations convertible into any class or classes of stock, or shares of stock of any class convertible into any class or classes, or obligations, shares of stock or other securities carrying warrants or rights to subscribe to shares of stock of the Corporation of any class or classes, in any case whether now or hereafter authorized, but any and all shares of stocks, bonds, debentures or other securities or obligations, whether or not convertible into stock or carrying warrants or rights entitling the holders thereof to subscribe to stock may be issued, sold or disposed of from time to time by the Board of Directors to such persons, firms or corporations and for such consideration, so far as may be permitted by law, as it shall from time to time in its absolute discretion determine, without offering the same to the holders of shares of stock of the Corporation or any class then outstanding.

"3. The Company shall be entitled to issue warrants for the purchase of common stock on such terms as the Board of Directors may determine but such warrants when issued shall be binding on future actions of the Board of Directors and the terms thereof shall not be altered, amended or repealed without the consent of such warrant holders, AND

"RESOLVED, that this resolution and the reorganization and recapitulation contemplated hereby be submitted to a vote of the shareholders, and if adopted by the requisite number of shareholders, all rights and privileges of the 5% Cumulative Preferred Shares heretofore expressed or inherent in the ownership of said Preferred Stock shall cease and determine as of August 1, 1957, except such right to surrender the said shares of stock on the terms herein contained except as otherwise provided by law, and

The Board of Directors, by such resolutions, approved certain corporate actions, which, if approved by a two-thirds vote of each class of its shareholders and carried out, would constitute a reorganization of National Alfalfa within the meaning of 26 U.S.C.A. § 368(a)(1)(E). Such actions were:

1. The entering into of a trust indenture with Fidelity-Philadelphia Trust Company of Philadelphia, Pennsylvania, as trustee, dated July 1, 1957, pursuant to the terms of which there would be issued $2,352,950 principal amount five per cent debentures, due July 1, 1975, and such debentures would be exchanged for all the shares of the outstanding cumulative preferred stock of National Alfalfa on the basis of one debenture for the principal amount of $50 for each share of such preferred stock of the par value of $50;

2. The issuance to each preferred stockholder participating in the exchange of his preferred stock for debentures of warrants effective August 1, 1957, for the purchase of common stock of National Alfalfa, on the basis of one warrant for each share of preferred stock exchanged, such warrants evidencing the right to purchase one-half share of common stock, but exercisable only for the purchase of full shares of such common stock at $10 per share at any time from the date of issue of such warrants to July 1, 1969; such warrants to be issued to and accepted by preferred stockholders participating in the exchange in lieu of the arrearage of cumulative dividends on their preferred stock;

3. (a) The amendment of the articles of incorporation of National Alfalfa, so as to provide for the issuance only of common stock;

(b) Increasing the number of shares of common stock from 763,000 to 1,000,000, and increasing the par value of the stock from $1 to $3.

The principal purpose of the reorganization was to enable National Alfalfa to extend easterly the territory in which it did business and effect a 50 per cent increase in its borrowing credit, which would be required by it for carrying the increased inventory which would result from such expansion. Such increase in the borrowing credit of National Alfalfa would be accomplished by issuing the five per cent debentures to the preferred stockholders in exchange for their preferred stock and the issuance to the preferred stockholders of the warrants to purchase common stock in discharge of the cumulative dividend arrearage.

The resolutions adopted by the Board of Directors of National Alfalfa were duly approved by the requisite number of votes of each class of stockholders at the regular annual meeting of National Alfalfa, held on July 23, 1957, and thereafter all of such resolutions were carried out.

National Alfalfa delivered to each of its preferred stockholders one $50, five per cent, debenture for each share of preferred stock held by such stockholders, and each of such stockholders delivered to National Alfalfa all of the shares of preferred stock held by him, and National Alfalfa retired such preferred stock.

In replying to a request for a ruling by Fidelity-Philadelphia Trust Company, the Treasury Department said in a letter to the Trust Company that no gain or loss would be recognized on the exchange of the $1 par value common stock for $3 par value common stock under the provisions of § 368(a)(1)(E) of the Internal Revenue Code of 1954, but gain or loss would be recognized to the preferred stockholders on the exchange

"RESOLVED, that the officers of the Company be hereby authorized to submit the Plan of Reorganization to the Commissioner of Internal Revenue in an attempt to have the said Plan qualified as a tax free reorganization under the Internal Revenue Code of 1954, and

"RESOLVED, that the officers of the Company be hereby authorized to incur any and all necessary expenses to effectuate the Plan of Reorganization approved and adopted by this meeting of the Board of Directors."

of their preferred stock for debenture bonds.

National Alfalfa also delivered to each of such preferred stockholders and each of them accepted warrants to purchase common stock of National Alfalfa, as set forth above, in satisfaction of the dividend arrearage on his preferred stock.

The indenture required that National Alfalfa should create a sinking fund for the retirement of the debentures by the following provision:

"The Company (National Alfalfa) covenants and agrees that on or before the expiration of 90 days after the end of each fiscal year of the Company commencing with the fiscal year ending April 30, 1959, it will pay to the Trustee as and for a contingent sinking fund for the redemption of Debentures at the sinking fund redemption price of 100% of the principal amount of the Debentures so to be redeemed, together with accrued interest to the redemption date, a sum in lawful money of the United States of America sufficient to redeem $196,080 principal amount of said Debentures, provided that in any year when the Consolidated Net Income is insufficient to redeem $196,080 principal amount of said Debentures the amount required to be paid over to the Trustee shall be 100% of such Consolidated Net Income and the difference between that sum and $196,080 shall accumulate to be paid from the Consolidated Net Income of subsequent years and provided further that the Company must commence the accumulation of income for sinking fund purposes by setting aside 100% of Consolidated Net Income up to $196,080 in each year commencing with the year beginning May 1, 1957."

National Alfalfa has never been in default in the performance of anything required to be done by it by the terms of the debentures and the indenture.

On April 30, 1967, only 11,626 of the original debentures issued by National Alfalfa remained outstanding, and it had redeemed or otherwise repurchased and retired the other 35,433 debentures issued by it.

As shown by over-the-counter bids to purchase and offers to sell, the fair market value of each share of the preferred stock on July 23, 1957, was $33.

The debentures expressed unconditional and legally enforceable obligations on the part of National Alfalfa to pay the face amount thereof, with accrued interest, at the times and in the manner provided therein.

The indenture provided that:

"This Indenture and the Debentures issued hereunder shall be subordinate only to current bank borrowings for inventory purposes which obligations mature by their original terms in less than twelve months and obligations of the Company (National Alfalfa) to suppliers of materials, services and labor incurred in the normal course of the Company's business and reasonably required in its operations, which obligations are due and payable when billed, and to any existing liens, encumbrances, mortgages, conditional sales agreements, or pledges, or any replacement, renewal, or extension thereof * * * "

and, unless consented to by the holders of at least 66⅔ per cent of the debentures outstanding when done, it should not be subordinated to any funded debt created, issued, assumed, or guaranteed by National Alfalfa or any subsidiary thereof, with certain enumerated exceptions.

The indenture contained many other provisions for the protection of the priority of the debentures and the rights of the debenture holders, but it would unduly lengthen this opinion to set them out in detail.

In its income tax returns for its fiscal years ending April 30, 1958, through April 30, 1967, National Alfalfa claimed deductions for interest paid by reason of the debenture discount alleged to have resulted from the difference between the fair market value of $33 of the pre-

ferred stock on July 23, 1957, and the face amount of the debentures then issued by it to the holders of its preferred stock. These deductions were computed on the basis of straight line amortization of the interest discount and the amortized amounts with respect to debentures retired in those years. The deductions in earlier years were included in losses carried over to the fiscal year ending April 30, 1967.

The Commissioner of Internal Revenue disallowed National Alfalfa's claimed deduction of $109,804 for interest paid, resulting from debenture discount for its fiscal year ending April 30, 1967, and also disallowed $321,657 of claimed deductions for interest paid, resulting from like discounts for the fiscal years ending April 30, 1958, through April 30, 1966, and determined deficiencies accordingly. Upon National Alfalfa's petition to the Tax Court to review the action of the Commissioner, the Tax Court affirmed the deficiencies asserted by the Commissioner. From the decision of the Tax Court, 57 T.C. 46 National Alfalfa has appealed to this court.

The decision of the Tax Court was based on the asserted proposition that where a corporation has issued its five per cent cumulative preferred stock at a stated par value (here, $50 per share) and thereafter issues its $50 debentures obligating it to pay the principal thereof at the times stated therein, and in the indenture under which the debentures were issued, together with interest at a stated percentage (here, five per cent) at the times stated in the debentures (here, semiannually), and exchanges such debentures for its preferred stock on the basis of one debenture for each share of preferred stock, although the market value of the preferred stock is less than its par value at the time of the exchange (here, $33 per share, or $17 less), thus giving the preferred share-

holders a discount from the stated principal amount of the debentures (here, a discount of $17 per share), a corporation issuing the debentures (here, National Alfalfa) is not entitled to a discount reduction as for interest paid, amortized over the life of the debentures, for the reason it received for each preferred share at the time it was issued the identical amount of the stated principal payable under each debenture and therefore suffered no loss. And it so held; notwithstanding while the Treasury Regulations originally treated bond discount as a loss, since prior to 1957 they have treated it as interest paid,[2] which is supported by respectable authority, as we shall hereafter show.

The applicable Regulation in effect during the taxable year here involved is Treas.Reg. § 1.61–12(c)(3), T.D. 6272, 1957–2 Cum.Bull. 18, 32, which in part here pertinent reads:

"If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds."

Section 1.61–12(c)(3) was amended in 1968 by T.D. 6984, 1969–1 Cum.Bull. 38, and the pertinent language of the former Regulation was carried over to current Treas.Reg. § 1.163–3(a)(1).

█ A taxpayer has the unqualified right under the Federal Income Tax statutes to deduct from his gross income in a tax year interest actually paid in such year in a bona fide transaction.

As above stated, the Treasury Department, at all times here pertinent, has held that bond or debenture discount is deductible, not as a loss, but as interest paid, amortized over the life of the bond or debenture.

And as we shall show, infra, with the exception of the Court of Claims, the courts that have passed on the question

---

2. See American Smelting & Refining Co. v. United States, 3 Cir., 130 F.2d 883, 885 (1942); Treas.Reg. 33, Rev. Art. 150; Treas.Reg. 45, Art. 554(3)(a); Treas. Reg. 62, Art. 545(3)(a); Treas.Reg. 65,

Art. 545(3)(a). The Treasury Regulation in effect during the taxable year here involved is § 1.61–12(c)(3), T.D. 6272, 1957–2 Cum.Bull. 18, 32.

have held that bond or debenture discount arises when the issuer of bonds or debentures exchanges them for preferred stock or securities theretofore issued by it, of less value than such bonds or debentures, and that such difference in value is deductible as interest prorated over the life of the bonds or debentures.

Assume that National Alfalfa sold 200 of its $50 debentures to John Doe at a discount of $17 per debenture and received $6,600 for such debentures; and in the same tax year that it sold such debentures, it purchased from one of its preferred stockholders 200 shares of its $50 par value preferred stock at the market price of $33 per share. Could there be any doubt that National Alfalfa could deduct from its gross income the $17 discount on each of such debentures so sold as interest paid, amortized over the life of the debentures? We think the answer is obviously "No." Yet the $17 discount, plus $33, is exactly the same amount National Alfalfa received for such preferred shares when it sold them.

Assume the same facts stated in the above example, except National Alfalfa sold such 200 debentures at a discount of $17 per debenture to one of its preferred stockholders; and from the same stockholder in the same tax year purchased 200 shares of its preferred stock for $33 per share. Would there be any doubt of the right of National Alfalfa to likewise deduct from its gross income such $17 discount as interest paid, amortized over the life of the debentures? Again, we think the answer is obviously "No," yet as in the first example the $17 discount, plus $33 per share, is the same amount National Alfalfa received for each share of such preferred stock when it sold it.

In substance, there is no difference between the facts in the instant case and the facts in the second example stated above.

Hence, we hold that the decisions of the Commissioner and the Tax Court in the instant case are based on a nonapplicable premise, viz., that National Alfalfa suffered no loss.

At this point, we think it would be helpful if we show what the result would be if National Alfalfa were permitted to deduct as interest amortized or prorated over the life of the debentures, which was 18 years, the difference between $50, the principal amount of each debenture, and $33, the market value of each certificate of preferred stock, or $17. That amount, prorated over the life of the debentures, would be 95 cents per year on each debenture, and would equal interest thereon at the rate of .019 per year. While the discount, in effect, would be paid in advance, the total deduction could not be taken in the tax year in which the exchange took place. It would have to be amortized over the life of the debentures. The picture looks quite different when the result is thus broken down.

The Tax Court relied principally on the decisions of the Court of Claims in Erie Lackawanna Railroad Company v. United States, 422 F.2d 425, 190 Ct.Cl. 682 (1970), and Missouri Pacific Railroad Company v. United States, 427 F. 2d 727, 192 Ct.Cl. 318 (1970).

In the former case, the Railroad Company, after being authorized so to do by the Interstate Commerce Commission, exchanged its five per cent debentures, due January 1, 2020, for shares of Series "A" five per cent preferred stock. The basis of the exchange was one income debenture in the principal sum of $100 for one share of preferred stock having a par value of $100. The market value of the preferred stock at the time of the exchange of the debentures for stock was $22,558,224.46, which was $5,217,975.54 less than the $27,776,200 maturity value of the debentures. The Railroad Company claimed such difference represented bond discount and was deductible as interest paid, amortized over the life of the debentures. The Court of Claims held that the Railroad Company was not entitled to deduct such

discount, since the amount received by it for its preferred stock when issued was the same as the principal amount of the debentures, and therefore it suffered no loss in the exchange. In the opinion, the court said:

"The position which this court does take in regard to the issue at hand is that since plaintiff was exchanging $100 debentures for preferred stock for which it had already received $100 in value, then plaintiff lost nothing as a result of the transaction. Since there was no actual difference between the face value of the debentures and the amount received in return for them ($100 preferred stock), there was no discount which could be amortized over the life of the bonds. The fact that the preferred stock had a market value less than $100 at the time of the exchange is of no consequence in this type of transaction where the plaintiff is purchasing its own stock. What is important in this case is the value received for the stock at the time of its issuance. Since plaintiff issued its stock for $100 per share and carried the stock on its books at this amount, this is the figure which should be used to determine whether a discount has arisen. * * * "

In the latter of the two cases, Missouri Pacific and its subsidiaries reorganized in a proceeding under 11 U.S.C. § 205, pursuant to a plan approved by the Interstate Commerce Commission and the United States District Court having jurisdiction of the reorganization proceedings. Under the plan, Missouri Pacific issued: (1) Collateral trust notes; (2) first mortgage 4¼ per cent bonds (series B and C); (3) general mortgage income 4¾ per cent bonds (series A and B); (4) 5 per cent 90-year debentures; and (5) stock in exchange for its own outstanding debt securities and stock of its subsidiaries; and the subsidiaries were merged into the parent corporation.

The terms of the exchange varied. In some cases, bondholders received new debt securities equal in amount to the sales value of the sum total of their bonds, plus interest accrued and unpaid by Missouri Pacific and its subsidiaries during the process of the reorganization. The accrued interest was deducted by Missouri Pacific from its gross income for federal income taxes in the year it became due. It also took deductions for amortized bond discount, predicated on the fact that the aggregate value of the new bonds issued pursuant to the plan was greater than the value of the securities received in exchange, as shown by New York Stock Exchange price quotations. Missouri Pacific claimed that the aggregate maturity value of the bonds was $529,117,141, while the fair market value of the old securities received in the exchange was $452,151,252, or a difference of $76,965,889, and that such difference in value represented debt discount and was deductible as interest amortized over the life of the new bonds. The court held that Missouri Pacific was not entitled to deduct such discount, because the par value of the old bonds when issued was their "true valuation * * * so far as plaintiff (Missouri Pacific) is concerned." The court held that for the purpose of income tax deduction for bond discount, bonds received in exchange for new bonds are in a completely separate category from other types of property received for the new bonds, and that the value of the old bonds so exchanged should be the amount received therefor by Missouri Pacific at the time they were issued, rather than their market value at the time of the exchange. In so doing, the court followed its decision in the Lackawanna case, where it held that the preferred stock of the Railroad Company was received by it in exchange for debentures; that the principal amount of the debentures was the same as that received for the preferred stock when issued; and it suffered no loss in the exchange and no discount was allowed.

The two Court of Claims decisions supported the decision of the Tax Court in the instant case, but there is other respectable authority to the contrary. Moreover, the two Court of Claims decisions and the decision in the instant case, as we have heretofore shown, are based on an erroneous premise, namely, that the question is not whether there was a debenture discount which served the purpose of stated interest, but whether there was a loss suffered.

And we regard it as anomalous for the Department of the Treasury to hold in the instant case that National Alfalfa suffered no loss when it exchanged a $50 debenture for a share of preferred stock of the market value of $33, since it had received $50 for such share of preferred stock when it sold it, and to hold that the preferred stockholder realized a gain when he exchanged a share of preferred stock of a market value of $33 for a $50 debenture, when he paid $50 for such share of preferred stock when he purchased it.

■ It is firmly established by the adjudicated cases that where a corporation issues its bonds, including debenture bonds, which unconditionally oblige the corporation to pay the principal amount stated therein, together with interest thereon, at the times therein provided, and receives therefor the amount of the principal, less a discount, the amount of such discount is deductible as interest paid and should be amortized over the life of the bonds or debenture bonds.[3]

The reason for allowing the discount is that it represents the expense of borrowing. It serves "the same function as stated interest"[4] and "represents a part of the cost of the borrowed capital."[5]

The rationale stated above, with respect to the present treatment of discount as the same as interest paid on borrowed money, was followed and applied in a well considered opinion in American Smelting & Refining Co. v. United States, 3 Cir., 130 F.2d 883. There, bonds were exchanged for preferred stock of a subsidiary of the issuer, when such issuer owned all of the common stock of such subsidiary. The market value of the preferred stock received by the issuer of the bonds was less than the principal of the bonds. The court there rejected the contention made in the instant case, and held that the difference between the sale value of the bonds and the market value of the preferred stock at the time of the exchange represented a discount and was deductible as interest amortized over the life of the bonds.

American Smelting was followed in two subsequent District Court cases in the Fifth and Seventh Circuits, respectively, in Southern Fertilizer & Chemical Co. v. Edwards, U.S.D.C.M.D.Ga., 167 F.Supp. 879 (1955), and Industrial Development Corp. v. United States, D. Ill., 138 F.Supp. 63 (1956). Both cases involved the issuance of bonds in exchange for the issuer's preferred stock.[6]

In Montana Power Company v. United States, 3 Cir., 232 F.2d 541, cert. den. 352 U.S. 843, 77 S.Ct. 51, 1 L.Ed.2d 59, the court, while disallowing the discount under the facts of that case, at page 546 reaffirmed its decision in the American Smelting case.

3. Helvering v. Union Pacific Railroad Co., 293 U.S. 282, 55 S.Ct. 165, 79 L.Ed. 363 (1934).

4. United States v. Midland-Ross Corp., 381 U.S. 54, 57, 85 S.Ct. 1308, 1310, 14 L.Ed. 2d 214 (1965).

5. Helvering v. Union Pacific Railroad Co., 293 U.S. 282, 287, 55 S.Ct. 165, 168, 79 L.Ed. 363 (1934).

6. See also Nassau Lens Co. v. C. I. R., 2 Cir., 308 F.2d 39, where in answer to the contention of the Commissioner that "when a seller also becomes a financing medium by taking bonds issued at a discount instead of cash in exchange for property, the tax laws will not recognize a charge for the use of money," the court stated: "We find no support for such an assertion and reject it. See American Smelting & Ref. Co. v. United States, 130 F.2d 883 (3rd Cir. 1942)."

The case of Atchison, Topeka and Santa Fe R. Co. v. United States, 10 Cir., 443 F.2d 147 (1971), which was an income tax refund suit, involved the reorganization of the then existing Atchison, Topeka and Santa Fe Railroad Company, hereinafter referred to as the "Old Company." The facts in that case were these:

On December 23, 1893, the Union Trust Company of New York, trustee under the first and second mortgage bonds of the Old Company, filed a complaint in the United States Circuit Court for the District of Kansas, requesting the appointment of a receiver for the properties of the Old Company. Receivers were appointed. On January 1, 1894, the Old Company defaulted in payment of interest on its general mortgage bonds. The Union Trust Company filed a second complaint on March 12, 1894, seeking foreclosure of the mortgage and sale of the railroad's property described in the mortgages. A reorganization took place in 1895, whereby the Atchison, Topeka and Santa Fe Railway Company, hereinafter referred to as the "New Company," the present plaintiff and taxpayer in the action, was organized and acquired all the assets of the Old Company.

After the filing of the first complaint by the Union Trust Company in 1893, bondholder protective committees were quickly formed throughout the country. The stockholders later established the Atchison Protective Reorganization Committee to protect their interests. Following various negotiations, three of the existing bondholder committees created the Joint Executive Reorganization Committee. After arm's length negotiations with the other groups of security holders, the Joint Executive Committee formulated and proposed a plan of reorganization for the Old Company, which was finally approved on April 10, 1895. It proposed the foreclosure of the general mortgage, also referred to as the first mortgage, and the vesting of the properties acquired at the foreclosure sale into the New Company.

Under the plan, the general mortgage bondholders, the second mortgage bondholders, and the income bondholders of the Old Company were to place their respective securities in various depositories and receive in exchange therefor certificates of deposit; and the stockholders of the Old Company were to place their stock in various depositories and receive in exchange therefor certificates of deposit. Under the plan, the holders of the second mortgage bonds, of the income bonds, and of common stock were to pay a cash assessment totaling approximately $14,000,000 into a depository in order to be eligible to receive certificates of deposit and to participate in the plan.

The plan specified what the holders of securities of the Old Company, respectively, would receive in bonds, or bonds and preferred stock, of the New Company in exchange for their certificates of deposit, and what the stockholders of the Old Company should receive in common stock of the New Company in exchange for their certificates of deposit.

On August 27, 1895, the Union Trust Company filed a supplemental complaint in the Circuit Court, requesting that the properties of the Old Company be sold as a single parcel. The Joint Executive Committee was allowed by the court to intervene in the reorganization proceedings, requested the Union Trust Company to go forward with the sale, and the court so ordered. A special master sold the property for $60,000,000 at a public auction on December 10, 1895, to Edward King, President of the Union Trust Company, Victor Marawetz, and Charles Beeman, all representing the Joint Executive Committee. The court approved the sale on the same day, decreeing that the purchasers could transfer the property to a new corporation, subject to certain restrictions, including provision for paying certain general mortgage bondholders of the Old Company who had elected not to participate in the plan.

The next day, December 11, 1895, the property was deeded to the three men.

On December 12, 1895, the Joint Executive Committee incorporated the New Company, and the three men deeded the properties to it. The purchase price recited in the deed was $382,202,500, payable as follows: $96,990,500 par value of the New Company's general mortgage bonds; $51,728,000 par value of the New Company's adjustment mortgage bonds; $131,486,000 par value of the New Company's preferred stock; and 1,019,980 shares ($101,998,000 par value) of the New Company's common stock. The New Company delivered these securities and stock to the Joint Executive Committee, which placed them in the Union Trust Company. The Trust Company eventually effected the exchange of the old certificates of deposit for the securities of the New Company.

The basis of the New Company's claim for an income tax refund was that it issued general mortgage and adjustment bonds in exchange for the intangible claims of the general mortgage bondholders of the Old Company; that the fair inherent value of such claims was less than the par value of taxpayer's bonds issued in exchange therefor, and that such difference constituted discount amortizable for federal income tax purposes.

At the trial below, the court ruled that in substance the bonds of the New Company were exchanged for the bonds of the Old Company, and submitted to the jury the questions of whether the fair market value of the bonds received was less than the par value of the bonds paid, and whether such difference constituted amortizable bond discount. The jury found a difference of $56,480,548, and decided that such amount constituted original issue discount.

This court held that the last step in the transaction determined the substance of what had occurred, and that the New Company issued its general mortgage and adjustment bonds in exchange for the intangible claims of the general mortgage bondholders of the Old Compa-

ny; that the fair inherent value of such claims was less than the par value of the taxpayer's bonds issued in exchange therefor, and that such difference constituted discount amortizable as interest paid for federal income tax purposes. The court said:

"Clearly the taxpayer would have been entitled to a deduction for discount had the bonds been sold on the market at a discount, and the proceeds used to purchase the assets of the Old Company."

The court further held that there was no difference in substance between that and what actually happened in the reorganization proceeding, and cited the American Smelter Company case, in which it was said:

"We believe that the discount is still to be treated as additional interest when the subject matter of the loan is stock instead of cash."

The court further stated:

"This view conforms with economic and business reality which recognizes that to the issuer bond interest is reflected both by the stated rate of interest and by the amount below or above par received by the issuer when the bonds are originally distributed. The taxpayer in this case presented substantial evidence from experts in railroad securities and properties who relied on the documents surrounding the reorganization, market conditions and actual trading, and valuation of the railroad properties as establishing the economic basis for and probable existence of discount * * *"

and affirmed the judgment of the lower court.

■ We repeat that we are of the opinion that the decisions of the Tax Court and of the Court of Claims are predicated on an unsound premise when they hold that whether or not deductions shall be allowed, because of discount as interest paid, depends on whether the taxpayers claiming such deductions suffered a loss in the transactions.

We hold, because it is now settled by the decisions of the Supreme Court, that the deduction is for interest charged by reason of a discount, and not as a loss suffered by the taxpayer.[7]

■ The decision of the Tax Court sustaining the deficiency assessed by the Commissioner against National Alfalfa for its tax year ending April 30, 1967, and holding that there was a deficiency in income tax due from National Alfalfa for such tax year of $147,949.76 is reversed;

And the case is remanded, with instructions to direct the Commissioner to allow National Alfalfa to deduct from its gross income for such tax year that portion of the total debenture discount which is deductible as interest paid, amortized, or prorated over the life of the debentures, 18 years, allocable to such tax year ending April 30, 1967; and also to deduct an amount for loss carryovers from prior years, in view of our holding that the debenture discount was deductible as interest paid, amortized over the life of the debentures, provided National Alfalfa was entitled to take a deduction in its return for its tax year ending April 30, 1967, for losses suffered in prior years, a question not raised nor passed on by this court on this appeal.

HILL, Circuit Judge (dissenting).

I am compelled to respectfully dissent from the majority opinion. My colleagues, in rejecting certain cases, in my opinion have done so on the basis of a rule of law gleaned entirely out of context when viewed with other cases in which this same problem is confronted.

The majority reject Erie Lackawanna Railroad Company v. United States, 422 F.2d 425, 190 Ct.Cl. 682 (1970), and Missouri Pacific Railroad Company v. United States, 427 F.2d 727, 192 Ct.Cl. 318 (1970), modified, 433 F.2d 1324, 193 Ct.Cl. 257 (1970), cert. denied, 402 U.S. 944, 91 S.Ct. 1618, 29 L.Ed.2d 112, on the basis that those cases "are based on an erroneous premise, namely, that the question is not whether there was a debenture discount which served the purpose of stated interest, but whether there was a loss suffered." I agree with the majority to the extent that loss is not synonymous with discount, but rather that discount "serves 'the same function as stated interest' and 'represents a part of the cost of the borrowed capital.' " I must conclude, however, the concept of loss as used in those cases is correct when read in context with other cases.

In St. Louis-San Francisco Railway v. United States, 444 F.2d 1102, 1106, 195 Ct.Cl. 343 (1971), cert. denied, 404 U.S. 1017, 92 S.Ct. 678, 30 L.Ed.2d 665, the court there rejected any discount in either of two exchanges on the basis "that there was an exchange of equals." In analyzing its decision in Erie Lackawanna, the court stated discount was not allowed in that case because "equivalents had been exchanged and no discount could be said to arise." When loss is thus analyzed in the context of whether there was a disparity in values in an exchange, those cases rejected by the majority are clearly authoritative.

A further example of application of this "equivalency of exchange" formula is provided in Cities Service Company v. United States, 316 F.Supp. 61 (S.D.N.Y.1970). In that case there was a disparity in values in an exchange of de-

---

7. We are also of the opinion that the case of Claussen's, Inc. v. United States, 5 Cir., 469 F.2d 340 (decided November 16, 1972) is clearly distinguishable on the facts from the instant case. In that case, the corporation involved not only issued its bonds in exchange for its outstanding Class A and Class B common stock, but also issued its new common stock to each of its old holders of Class A and Class B common stock, in direct proportion to their original equity interest in the corporation. The court held that the common stockholders' equitable posture relative to the corporation and to one another after the exchange was substantially the same as it was before the exchange, and hence no bond discount arose.

bentures for preferred stock due to the higher value of the debentures being offered in exchange. The court there allowed discount measured by the amount of that disparity. That excess represented the true additional consideration which the company was required to pay in retiring its outstanding preferred stock.

The cases cited applying the equivalency of exchange formula have uniformly held that where the corporation is retiring its own outstanding bonds or stock in an exchange transaction, the value to be ascribed those outstanding bonds or stock shares is the value originally received by the corporation in exchange for that outstanding obligation. I am not persuaded that the cases cited in the majority opinion require fair market value to be ascribed the outstanding obligations, as those cases are distinguishable. Both Atchison, Topeka and Sante Fe Railway Co. v. United States, 443 F.2d 147 (10th Cir. 1971), and American Smelting & Refining Co. v. United States, 130 F.2d 883 (3d Cir. 1942), involved corporations exchanging their debt obligations for the outstanding obligations of another corporation. In both cases, the corporation assuming the outstanding obligations was not the corporation which had originally received the consideration for those obligations. This distinction was noted in Erie Lackawanna, supra, and remains viable today, although apparently modified to the extent that the value of outstanding obligations of a subsidiary, when assumed by the parent corporation, is the consideration originally received by the subsidiary rather than the market value of the outstanding

obligation.[1] Market value is therefore relevant only when the assuming corporation is other than the corporation which originally issued the obligation.

I would note also that Southern Fertilizer & Chemical Co. v. Edwards, 167 F.Supp. 879 (M.D.Ga.1955), and Industrial Development Corp. v. United States in 51 A.F.T.R. 1514, 56–2 U.S. T.C. ¶ 10,066, on which the majority rely, contain only findings of fact and conclusions of law with no detailed discussion of the question. I therefore, as did the court in Erie Lackawanna, reject those cases as authoritative. I likewise distinguish Montana Power Company v. United States, 232 F.2d 541 (3d Cir. 1955), cert. denied, 352 U.S. 843, 77 S.Ct. 51, 1 L.Ed.2d 59, on the facts, as the issue presented there related to proof of value of property originally exchanged for the corporate obligation. We are here confronted with an exchange of a subsequent corporate obligation for a prior obligation.

My close reading of the cases reveals a formula to be followed when a corporation issues its debt obligation in exchange for its own prior outstanding obligation. In applying this formula, the value assigned the outstanding obligation is the consideration received by the corporation when originally issued. Any discount, therefore, is dependent on a showing of disparity in values reflected by the higher value of corporate debt obligation given in exchange. If there is no disparity in value, that is, if there is an equivalency in the exchange, no discount arises. The facts here clearly show only equivalent exchanges. I would, therefore, affirm the decision of the Tax Court.

1. See Missouri Pac. R.R. Co. v. United States, 427 F.2d 727, 192 Ct.Cl. 318 (1970), modified, 433 F.2d 1324, 193 Ct.Cl. 257 (1970), cert. denied, 402 U.S. 944, 91 S.Ct. 1618, 29 L.Ed.2d 112.